UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA,        ) | |
| )| |
| Plaintiff,        ) | No. 6:09-CR-17-GFVT |
| ) | |
| v.        ) | |
| ) | RECOMMENDED DISPOSITION |
| DENNIS R. NEELEY,        ) | |
| ) | |
| Defendant.        ) | |
| ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Dennis R. Neeley, indicted for drug and gun charges, *see* DE #1 (Indictment), filed a motion to suppress all statements he made to law enforcement officers on July 15, 2008. *See* DE #15 (Motion). According to the motion, officers interrogated Neeley in custody without proper *Miranda* warnings, then ineffectively tried to cure the rights violation by administering *Miranda* warnings mid-interrogation and re-eliciting purportedly incriminating statements. *See id.* Subsequently, Defendant contends, the officers took a break to search his residence, but failed to re-administer *Miranda* warnings as required before resuming interrogation. *See id.* The United States responded in opposition, asserting that Neeley was not in custody during the questioning and, thus, officers had no obligation to give *Miranda* warnings during the time in question. *See* DE #17 (Response). The Court conducted an evidentiary hearing, which provided both parties an opportunity to provide evidence and argue their positions. *See* DE #21 (Minute Entry).

For the reasons stated below, the Court **RECOMMENDS** that the District Judge **DENY** the motion to suppress. As to this constitutional challenge, Defendant's statements should be

admissible at trial.

## I. Background Information

Defendant's motion concerns a series of events that occurred on July 15, 2008, when the Kentucky State Police Marijuana Eradication Strike Force entered the property where Neeley lives. The Team's aerial surveillance unit allegedly spotted marijuana plants during a flyover of the area, *see* Tr. 9 at lns. 1-2,[1] and the Strike Force converged to eradicate those plants. *See id.* at lns. 5-9. The only record of the day's events, an audio recording made by Trooper Jeremy Devasher,[2] reflects three distinct time periods of significance: (1) from arrival on the scene until the administration of *Miranda* warnings during interrogation of Neeley;[3] (2) from the administration of those warnings until cessation of the initial interrogation; and (3) from beginning to end of a second interrogation of Neeley completed after a break during which the Strike Force searched his house. The Court develops these three intervals of time, based on testimony and evidence presented.

---

[1] All transcript citations in this Recommended Disposition refer to the Motions Hearing Transcript (DE #23).

[2] According to Trooper Devasher's testimony at the motions hearing, he created this recording by placing a small device in his front pocket without the knowledge of Defendant. *See* Tr. 10 at lns. 5-18. The audio was then transferred to a CD-ROM, *see id.* at lns. 21-25; Tr. 11; and Tr. 12 at lns. 1-12 which was admitted into evidence at the hearing as Government Exhibit One. *See* Tr. 25 at lns. 2-11.
Neeley placed no evidence in the record to counter Devasher's testimony. The only additional evidence before the Court is a Kentucky State Police Consent to Search form, *see* Tr. 15 at lns. 20-25; Tr. 16 at lns. 1-4, which Defendant completed and signed on the day in question and which the United States introduced into evidence as Government Exhibit Two at the hearing. *See* Tr. 25 at lns. 2-11.

[3] At the motions hearing, the United States conceded that Defendant had been interrogated. *See* Tr. 47 at lns. 8-9. Accordingly, the Court utilizes that well-supported characterization and focuses on "custody" vel non.

Arrival on the Scene Until *Miranda* Warnings

Upon entering the property, Trooper Devasher encountered Neeley near the back door of the house. *See id.* at lns. 13-15; Tr. 36 at lns. 15-21. Defendant walked Devasher to four marijuana plants, which the Strike Force allegedly had spotted from the air. *See* Tr. 9 at lns. 19-24. Neeley openly disclosed that he had been charged with marijuana cultivation previously. *See* Tr. 14 at lns. 5-11.

Walking back, Trooper Devasher and Neeley approached the house, and Devasher asked whether officers could enter. *See* Tr. 13 at lns. 5-7; Tr. 14 at lns. 17-18. Defendant obliged, and Trooper Devasher said, "Have a seat if you would. We'll talk about some things here." *See* Exhibit One, Track One, at 01:10-01:20.[4] The trooper confirmed Neeley's account of his prior charge, *see id.* at 01:30-01:55, and described the Strike Force's mission as about eradicating plants, suggesting that Neeley could help himself by sharing information about larger plots of marijuana. *See id.* at 02:55-04:15. Defendant talked about killing rats. *See id.* at 02:30-02:40.

Trooper Devasher asked more questions about Defendant's practices and experiences with marijuana, including:

- "How long you been growing? How long you been growing dope?," *see id.* at 05:08-05:12;

- "How'd you, uh, who taught you how to grow or where you'd pick up on it from?," *see id.* at 05:26-05:30;

- "How'd you generally get more plants? I'm curious," *see id.* at 05:33-05:36; and

- "You do any cloning at all? Clone any plants?," *see id.* at 05:44-05:48.

---

[4] Exhibit One includes four separate audio tracks.

3

Neeley responded to each question. *See id.* at 05:12-06:00. The television continued to play in the background. Defendant asked if someone turned him in, and Trooper Devasher indicated no. *See id.* at 06:55-07:15. After another minute, *see id.* at 08:18-08:30, Trooper Devasher presented a Consent to Search form and advised Neeley that, if he agreed with the form, he should fill out the information and sign. *See* Tr. 15 at lns. 20-25; Tr. 16 at lns. 1-4; Tr. 18 at lns. 11-18.

Once the form had been signed, two Strike Force members began searching the house systematically. *See* Tr. 17 at lns. 6-8. Trooper Devasher indicated that, if Defendant had verifiable information about someone else growing marijuana, he would speak with the prosecutor to try to have Defendant's matter discharged. *See* Tr. 19 at lns. 3-25; Tr. 20; Tr. 21 at lns. 1-5. Neeley's son entered the conversation, *see* Exhibit One, Track One, at 08:48, and Devasher included the son in questioning. The son indicated he worked for the forestry service fighting fires and listened to the trooper's observations about California fires. *See id.* at 08:48-09:23. Another officer noticed a room with the door locked, and Neeley and his son notified the officers that the room belonged to Neeley's mother, who now resided in a nursing home. *See id.* at 09:32-09:47. Trooper Devasher continued to ask questions, to which Neeley responded.

At this point, *see id.* at 11:48, Trooper Devasher indicated that he would be administering *Miranda* warnings. *See* Tr. 21 at lns. 12-25; Tr. 22 at lns. 11. He introduced this shift in approach: "We're gonna do things the right way because that's how Trooper Devasher does business." *See* Exhibit One, Track One, at 11:48-12:00. Devasher orally administered the following warnings:

> You do have the right to remain silent. Anything you say can and will be used against you in court or any other proceeding. You have the right to consult an attorney before making a statement or answering questions, and you may have an attorney with you during questioning. You may request the court to appoint an

4

> attorney for you if you cannot afford to hire one. You may stop the questioning at any time by refusing to answer any further questions or by requesting to consult with an attorney. Do you understand that sir?

*See id.* at 12:00-12:26. Neeley answered in a very low and gruff tone: "Yeah." *See id.* at 12:26-12:27.

After *Miranda* Warnings

After administering *Miranda* warnings, Trooper Devasher moved to review some of the information already gleaned. He explained, "Again we're back to presenting an accurate depiction of what's going on here and nothing but, alright?" *See id.* at 12:35-12:40. Devasher went through the information:

> You had four plants and four plants alone behind your house. Is that correct? . . . Transplanted, been out since about April. Is that right? . . . Grown pot about the last, what, couple years? . . . Less than five plants normally? . . . You say you get about $500 depending on well how the plant does planted . . . And your primary reason is because you say you have no income really?

*See id.* at 12:40-13:10. The trooper also re-verified the ownership of the house and the status of Neeley's relationship with the house owner. *See id.* at 13:14-14:57. During a pause, Defendant arose and walked towards the kitchen; he asked Trooper Devasher if the trooper would also like a drink, and Devasher politely declined. *See id.* at 14:58-15:10.

When Neeley returned, Trooper Devasher indicated that Neeley would be charged with cultivation of less than five plants. *See id.* at 15:38-15:42. The trooper stated that, before leaving, he would provide Defendant with a telephone number so if Defendant learned of any larger marijuana plots, Neeley could call the authorities and help himself. *See id.* at 15:42-16:12.

At this time, the KSP Richmond Post called Trooper Devasher. *See id.* at 16:12. The trooper noted to his caller that Defendant's reported prior conviction failed to show up in the

standard criminal history and asked the caller to check. *See id.* at 16:50-16:58; Tr. 22 at lns. 13-14. Once the Richmond Post confirmed the conviction, *see* Exhibit One, Track One, at 18:15-18:27, Trooper Devasher advised Neeley that he would be arrested. *See id.* at 18:45-18:50; Tr. 22 at lns. 15-21. Defendant asked for leniency: "Just write me a ticket. I mean, I'm not going nowhere." *See* Exhibit One, Track One, at 19:10-19:18. Devasher and a second trooper asked more follow-up questions about marijuana, this time focusing on the prior conviction as well. *See id.* at 20:52-21:32. As before, Neeley responded to each question. *See id.* Devasher and Defendant also talked about their work histories. *See id.* at 22:10-22:43.

    At this point, Trooper Devasher turned more attention to the search of the house, joining his two Strike Force colleagues. *See* Tr. 22 at lns. 23-25. The troopers continued to have trouble getting into the one locked room, and Neeley asked if his son could go get the key. *See* Exhibit One, Track One, at 22:57-23:47. Devasher said that plan would be fine. *See id.* at 23:47-23:51. Defendant and his son advised the officers that they never go in the locked room and it solely belongs to Neeley's mother; however, the officers indicated the room must be searched. *See id.* at 24:17-24:22. The officers decided to search the son's bedroom before the son could leave. *See id.* at 24:26-24:36.

Second Interrogation

    Next, Trooper Devasher searched more of the house, *see* Exhibit One, Track Two, at 00:00-00:43; questioned Defendant's son regarding marijuana paraphernalia located during the search, *see* Exhibit One, Track Three, at 00:00-05:58; and visited briefly with Defendant's neighbors. *See* Exhibit One, Track Four, at 00:40-01:44. After questioning Neeley's son, the trooper indicated the time to be 12:00 Noon. *See* Exhibit One, Track Three, at 05:50-05:58. At

the beginning of Track Four, Trooper Devasher observed the time to be 12:40 p.m. *See* Exhibit One, Track Four, at 00:00-00:07.

Finally, Trooper Devasher returned to ask Neeley more questions, but elected not to readminister *Miranda* warnings. *See id.* at 02:00; Tr. 33 at lns. 9-16. The Strike Force had located a short-barreled shotgun equipped with a laser scope during the search, and Devasher interrogated Defendant about it. *See* Tr. 23 at lns. 3-7, 16-25. Neeley explained, "We found that. Found that in that building there." *See* Exhibit One, Track Four, at 02:07-02:12. Moreover, Neeley clarified who had used the firearm: "I kill rats with it." *See id.* at 02:28-02:34; Tr. 23 at lns. 21-22. Trooper Devasher indicated the time to be 12:45 p.m. *See* Exhibit One, Track Four, at 03:32-03:38.

## II. Analysis

Defendant's motion contends that his initial statements should be suppressed because he endured custodial interrogation without required *Miranda* warnings, thus violating his Fifth Amendment right against self-incrimination. *See* DE #15. The motion further contends that *Miranda* warnings administered in the middle of the interrogation failed to cure the taint of the prior violation, requiring suppression of subsequent statements. *See id.* Finally, the motion asserts that, after a break in questioning during which a sawed-off shotgun was purportedly found and seized, officers restarted interrogation improperly by not re-administering *Miranda* warnings, resulting in statements again taken in violation of the Fifth Amendment. *See id.*

In response, the United States argues that Neeley never faced custodial interrogation during the circumstances in question. *See* DE #17. Specifically, officers administered the *Miranda* warnings early out of an abundance of caution, even though Defendant was not yet in

custody, and this administration (and Neeley's waiver) ensured that subsequent statements could be utilized at trial with respect to the Fifth Amendment right against self-incrimination. *See id.* At the hearing, the United States conceded that Neeley faced interrogation, but emphasized its position that Neeley cannot be considered to have been in custody at any point relevant to the motion to suppress. *See* DE# 21.

The Self-Incrimination Clause of the Fifth Amendment guarantees that an individual may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.[5] To protect this right, the United States Supreme Court's decision in *Miranda v. Arizona*, 86 S. Ct. 1602 (1966), "requires law-enforcement officers to give warnings, including the right to remain silent, before interrogating anyone whom the officers have placed 'in custody.'" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury v. California*, 114 S. Ct. 1526, 1528 (1994)) (quoting *Oregon v. Mathiason*, 97 S. Ct. 711, 714 (1977) (per curiam)). The *Miranda* decision focused primarily on "reduc[ing] the likelihood that . . . suspects would fall victim to constitutionally impermissible practices of police interrogation." *Garner v. Mitchell*, 557 F.3d 257, 262 (6th Cir. 2009) (quoting *New York v. Quarles*, 104 S. Ct. 2626, 2632 (1984)). As the *Miranda* court described,

> We have concluded that without proper safeguards, the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him [or her] to speak where he [or she] would not otherwise do so freely. *In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination*, the accused must be adequately and effectively apprised of his [or her] rights and the exercise of those rights must be fully honored.

---

[5] This right restricts the actions of states, as well as the federal government. *See Malloy v. Hogan*, 84 S. Ct. 1489, 1492 (1964).

*Miranda*, 86 S. Ct. at 1624 (emphasis added).[6]

Regarding custody in particular, a suspect should receive *Miranda* warnings when "there has been a 'formal arrest or restraint on freedom of movement.'" *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Mathiason*, 97 S. Ct. at 714). The restraint on movement must be "of the degree associated with a formal arrest." *California v. Beheler*, 103 S. Ct. 3517, 3520 (1983) (per curiam). A defendant seeking suppression of a statement has the burden of establishing custodial interrogation. *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). Courts consider "how a reasonable man in the suspect's position would have understood the situation" under a totality of the circumstances. *See United States v. Swanson*, 341 F.3d 524, 528-29 (6th Cir. 2003). This analysis "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 114 S. Ct. at 1529. Relevant factors for analysis include, but are not limited to, "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer questions." *Panak*, 552 F.3d at 465 (referencing *Swanson*, 341 F.3d at 529).

Any waiver of *Miranda* rights must be proven by the Government by a preponderance of the evidence. *See United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008). Such waiver must (1) "have been voluntary in the sense that it was the product of a free and deliberate choice rather

---

[6] The Eleventh Circuit has conducted an impressive examination of the broader historical context of the Self-Incrimination Clause. *See United States v. Gecas*, 120 F.3d 1419, 1435-57 (11th Cir. 1997) (en banc).

than intimidation, coercion, or deception," and (2) "have been made with full awareness both of the right[s] being abandoned and the consequences of the decision to abandon [them]." *Moran v. Burbine*, 106 S. Ct. 1135, 1141 (1986); *see Smith v. Mitchell*, 567 F3d 246, 257-58 (6th Cir. 2009) (distinguishing waiver in a *Miranda* analysis from waiver in a due-process voluntariness analysis). Moreover, a voluntary, knowing, and intelligent waiver must be established by "the particular facts and circumstances of the case, including the background, experience, and conduct of the accused." *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000) (quoting *United States v. Gaddy*, 894 F.2d 1307, 1312 (11th Cir. 1990)) (quoting *Johnson v. Zerbst*, 58 S. Ct. 1019, 1023 (1938)) (discussing waiver of constitutional rights in general). Waiver cannot be presumed by "mere silence." *See North Carolina v. Butler*, 99 S. Ct. 1755, 1757 (1979).

Depending on the facts and circumstances, continuing to talk openly with officers post-warning may suggest implied waiver. *See, e.g.*, *Butler*, 99 S. Ct. at 1757; *Nichols*, 512 F.3d at 798-800 (performing an implied-waiver analysis). These facts and circumstances include "the actions or words of the person interrogated," which may constitute more than "mere silence." *See Butler*, 99 S. Ct. at 1757. In the Sixth Circuit, "'waiver may be clearly inferred . . . when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights' and speaks." *United States v. Adams*, No. 08-5372, 2009 WL 3271187, at *8 (6th Cir. Oct. 14, 2009) (awaiting publication) (quoting *Nichols*, 512 F.3d at 798-99).

Against these constitutional principles, the Court considers Defendant's motion to suppress. To do so, the Court assesses the status of Neeley's Fifth Amendment right against self-incrimination at each of the three time intervals in question: (1) initial questioning prior to

*Miranda* warnings, (2) continued questioning subsequent to *Miranda* warnings, and (3) further questioning after a break to search the premises. As to the second and third intervals, the Court alternatively considers whether the *Miranda* warnings administered cured prior violations, if any, and lasted throughout the questioning without becoming legally stale.

A. Initial Interrogation Prior to *Miranda* Warnings

Outside and inside the house, Trooper Devasher asked questions about Neeley's marijuana cultivation and experiences. *See, e.g.*, Exhibit One, Track One, at 05:08-06:00; Tr. 14 at lns. 5-11. After about eleven minutes of interrogation inside, Devasher stopped to administer *Miranda* warnings. *See* Exhibit One, Track One, at 11:48-12:26. Defendant contends that these warnings came too late, after he had already been interrogated in custody. However, the Court rejects this argument because Neeley was not in custody during the time in question.

Under a totality of the circumstances, *see Swanson*, 341 F.3d at 528-29, Defendant experienced no custodial interrogation. At the hearing, Neeley offered no evidence to establish custody. Neither Trooper Devasher's testimony nor the audio recording (Exhibit One) reflects custody. Walking outside with Trooper Devasher and then sitting on his sofa, Defendant had "home-field advantage" in that everything occurred where he lives. *See Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008) (noting the home environment as significant in custody analysis); *see also United States v. Flores*, 193 F. App'x 597, 606 (6th Cir. 2006) (unpublished) (finding a suspect not in custody when questioned at his own home while sitting on his own sofa and not in handcuffs); *Martin v. United States*, No. 4:08-CR-079, 2008 WL 1767081, at *4-*5 (N.D. Ohio Apr. 16, 2008) (unpublished) (finding no custody where a defendant let officers into his home, faced questioning, chose his own seat in the home, admitted to the indicted conduct right away,

11

and suffered no handcuffs during questioning). Prior to entering the house, Trooper Devasher asked to enter, and Neeley permitted him, as well as other Strike Force officers, to enter. *See* Tr. 13 at lns. 5-7; Tr. 14 at lns. 17-18. During the conversational interrogation inside, Defendant kept the television on. Objectively, such circumstances cannot be likened in any fair way to the restraint on movement associated with formal arrest. *See Beheler*, 103 S. Ct. at 3520. Neeley's choice to sit on his sofa and answer questions posed by Devasher portrays no coercion. The trooper placed no physical restraints on Defendant and expressed no force or limitations.

To Neeley, his overt admission of a prior conviction signifies custody. Defendant asserts that, even if Trooper Devasher could not ascertain that conviction with certainty under a standard criminal history, the trooper (who admitted he would arrest if a prior conviction existed) had notice that an arrest was likely and would not have permitted Defendant to leave. Of course, an objective analysis of custody proceeds without regard to either the officer's or the defendant's intent, which makes speculation about motives or strategy somewhat tangential. *See Berkemer v. McCarty*, 104 S. Ct. 3138, 3151 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). Outwardly, Devasher actually communicated to Defendant his intent simply to cite Neeley for marijuana cultivation. *See* Exhibit One, Track One, at 15:42-16:12. The trooper encouraged Defendant to direct officers to larger marijuana crops grown by neighbors or other parties as a way to mitigate his jeopardy. *See id.* The trooper indicated that the prosecutor might be amenable to permitting Neeley to look around for crops before the matter would be determined, a characterization that plainly augurs no arrest. *See id.* A reasonable defendant would not have perceived the initial

questioning as custodial.

Throughout this interval of time, Neeley experienced no custodial interrogation, which means no *Miranda* warnings need have been administered. Trooper Devasher talked with Defendant and acquired information, while permitting Defendant to sit unrestrained in his own living room on his own sofa. Neeley has failed to carry the burden of proving custody.

B. Continued Interrogation Subsequent to *Miranda* Warnings

Prior to the midpoint of the interrogation, Trooper Devasher elected to administer *Miranda* warnings to Neeley. *See id.* at 11:48-12:26. According to Defendant, this decision resulted in impermissible *Miranda*-in-the-middle interrogation, which requires suppression of statements. However, during most of this period, custody still did not exist. Even when custodial, the interrogation reflected no violation of Neeley's right against self-incrimination because of proper warnings and waiver.

Under a totality of the circumstances, Defendant experienced no custodial interrogation for most of this time. That is, from an objective point of view, no reasonable person would have felt in custody to a degree similar to formal arrest. While Neeley may have pondered the seriousness of the events and possessed a growing concern about the potential outcome, he faced no objective restraint of movement, nor did Trooper Devasher or any officer attempt to make Neeley less comfortable, for instance removing him from the sofa. *See Flores*, 193 F. App'x at 606 (finding no custody in a similar factual situation). The troopers never drew their weapons or took out any handcuffs. *See* Tr. 36 at lns. 19-24. The entire proceedings occurred in the house where Neeley lived, and Neeley interacted freely with his son, as the son moved about the house and answered questions from Trooper Devasher. *See* Exhibit One, Track One, at 08:48-09:23.

During this time, the record indicates approximately three Strike Force officers were in the house, with two of the officers conducting a search and only coming in and out of the living room. *See* Tr. 17, lns. 2-8. Notably, post-*Miranda*, Defendant freely stood up and walked away from the sofa to get himself a drink in the kitchen. He offered the trooper a beverage. Such freedom of conduct contradicts a custodial setting.

The one exception is the short time period after Trooper Devasher confirmed the prior marijuana crime via the Post call and advised Defendant that he would be arrested and taken to jail. At this time, the interrogation objectively became custodial. Neeley's response indicated his awareness of the situation, as he asked for leniency: "Just write me a ticket. I mean, I'm not going nowhere." *See* Exhibit One, Track One, at 19:10-19:18. Trooper Devasher explained that he could not be lenient because Neeley had just been convicted the prior year for the same conduct. *See id.* at 19:22-19:42. At this time, a reasonable defendant could only have anticipated going to jail and, thus, would objectively have assumed his movement would be restrained henceforth. Trooper Devasher's earlier reading of *Miranda* warnings also contributes to an objective conclusion of custody at this time. *See United States v. Lopez-Arias*, 344 F.3d 623, 628 (6th Cir. 2003) (describing the reading of *Miranda* rights as contributing, but not dispositive, evidence of custody) (citing *United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994)). While the *Miranda* warnings themselves did not objectively create custody when administered, Devasher's later announcement about arrest combines with the *Miranda* warnings to compel an objective conclusion of custody.

Because the Court concludes that limited custodial interrogation occurred during this time interval, the Government must establish waiver of *Miranda* rights by a preponderance of the

14

evidence.[7] *See Nichols*, 512 F.3d at 798. Since the Strike Force neglected to utilize a written *Miranda* waiver, the Government must establish implied waiver. *See Adams*, 2009 WL 3271187, at *8. On the instant facts, Neeley's words and actions evince an implied waiver of *Miranda* rights and enable the Government to meet its burden.[8] The trooper read the *Miranda* warnings from a card, and Defendant sat silently during the administration of the warnings. *See* Exhibit One, Track One, at 11:48-12:26. Neeley expressed understanding of the *Miranda* warnings. *See* Exhibit One, Track One, at 12:00-12:27. He asked no questions about the warnings, nor took any actions exhibiting doubt or dissatisfaction. At no time before or after learning he would go to jail did Neeley invoke his right to remain silent or indicate in any way that he desired to cease the ongoing interrogation. Instead, Defendant listened to Trooper Devasher's questions, thought about them, and offered responses. Devasher and Neeley both maintained a friendly, non-combative tone, and this tone, which suggests voluntariness, remained the same after the

---

[7] Defendant urges a *Miranda*-in-the-middle analysis under *Oregon v. Elstad*, 105 S. Ct. 1285 (1985), and *Missouri v. Seibert*, 124 S. Ct. 2601 (2004). However, the conversational interrogation prior to the call from the KSP Richmond Post was not custodial, so Trooper Devasher could not have been attempting to cure a prior *Miranda* violation. Even under *Elstad* and *Seibert*, Neeley's statements should not be suppressed. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 427 n.11 (6th Cir. 2008) (suggesting that, until a controlling opinion is determined, courts should apply both the plurality and Justice Kennedy's concurrence from *Seibert*). Devasher's and Neeley's friendly, non-combative tone remained constant before, during, and after Neeley learned he had to go to jail. Defendant advised Devasher about the prior charge first, and the trooper simply followed up and advanced the interrogation from there. Throughout almost the entire interrogation, Neeley sat on his sofa, in his home, with the television on and his son nearby. While Devasher administered the *Miranda* warnings earlier than required, the Court heard no testimony about an impermissible question-first officer strategy. Without prior unwarned custodial interrogation, *Elstad* and *Seibert* do not apply.

[8] Neeley expressly communicated that he understood the rights. *See* Exhibit One, Track One, at 12:00-12:27. However, he never stated he would waive those rights. *See Butler*, 99 S. Ct. at 1757 (indicating that, without an express waiver, courts must presume none occurred unless subsequent conduct constitutes an implied waiver).

*Miranda* warnings and after the trooper advised Neeley he would go to jail. Additionally, Defendant responded right away each time, and his responses reflect an openness about potentially incriminating material. These exchanges go to the knowing and intelligent character of the implied waiver.[9] Even once Devasher confirmed Neeley's prior conviction and informed Defendant he would be going to jail, Defendant continued to speak openly about the matter, never expressing any desire to remain silent or otherwise end the interrogation. As noted previously, Neeley entered no evidence in the record and elected only for counsel to make an argument at the motions hearing, so the Court has only the Government's evidence to consider. By a preponderance of the evidence, the Government's proof establishes a knowing, voluntary, and intelligent implied waiver of *Miranda* rights by a cooperative defendant.

For these reasons, statements made by Neeley in the post-*Miranda* interval of the first interrogation should not be suppressed. First, no custodial interrogation occurred during most of the interval, which means no *Miranda* warnings need have been administered at all until after Defendant had been informed he was going to jail. Second, even once custodial interrogation occurred, Trooper Devasher's actions sufficiently protected Neeley's right against self-incrimination under the Fifth Amendment.

C. Second Interrogation After a Break to Search the Premises

After taking a break to continue searching the house, Trooper Devasher reapproached

---

[9] Neeley's prior experience with law enforcement cannot factor into the objective analysis of custody. *See Yarborough v. Alvarado*, 124 S. Ct. 2140, 2152 (2004). The Supreme Court noted that "reliance on [the defendant's] prior history with law enforcement was improper not only under the deferential standard of 28 U.S.C. § 2254(d)(1), but also as a *de novo* matter." *Id.* However, his previous interaction with the justice system – to include a prior cultivation conviction – does contribute toward the waiver analysis. *See Jackson v. McKee*, 525 F.3d 430, 436-37 (6th Cir. 2008); *United States v. Redditt*, 87 F. App'x 440, 445 (6th Cir. 2003).

Defendant to interrogate about a short-barreled shotgun with laser scope that had been found. *See* Exhibit One, Track Four, at 02:00-02:34. At this time, Devasher chose not to readminister *Miranda* warnings. Neeley argues that the decision violated his right against self-incrimination. Of course, based on the prior analysis, Neeley remained in custody at this subsequent time.

Because Defendant faced custodial interrogation during this interval, *Miranda* warnings must be sufficient to protect Defendant's right against self-incrimination. At the time custodial interrogation began, officers neglected to re-administer *Miranda* warnings. Accordingly, the United States relies on the previously administered *Miranda* warnings; the Government contends these warnings had not gone stale.

Based on the Court's review, neither the United States Supreme Court nor the Sixth Circuit has examined this specific factual situation: whether pre-custodial rights advice satisfies *Miranda* for temporally proximate custodial interrogation. However, the Sixth Circuit has utilized a totality-of-the-circumstances analysis to deny challenges to incriminating statements obtained after various post-arrest breaks in questioning. *See, e.g.*, *United States v. Weekley*, 130 F.3d 747, 751-52 (6th Cir. 1997) (determining a one-hour break to be acceptable and cataloguing cases showing re-administration of *Miranda* not required *per se*)[10]; *United States v. White*, 68 F. App'x 535, 537-38 (6th Cir. 2003) (unpublished) (finding a three-day break permissible, where the defendant had requested time to think and was reminded of his rights); *United States v. Harris*, 983 F.2d 1069, at *5 (6th Cir. 1992) (table) (per curiam) (identifying a burden on

---

[10] The *Weekley* court cited and partially relied on Congress's ill-fated attempt to legislate criteria for admissibility of confessions. *See Weekley*, 130 F.3d at 751 (citing 18 U.S.C. § 3501, which was declared unconstitutional by *Dickerson v. United States*, 120 S. Ct. 2326, 2336 (2000)).

defendants to indicate a desire to remain silent and finding *Miranda* rights still in effect after "several hours"). Additionally, the Seventh Circuit just ruled in a similar case and articulated a like standard:

> The practical question is not whether *Miranda* warnings given to a defendant became "stale," or, though the courts love the phrase, whether the "totality of the circumstances" indicates that the inculpatory statement was made knowingly. It is whether the defendant when he gave the statement didn't realize he had a right to remain silent. The *Miranda* form told him he had that right, and the presumption should be that he would remember this even if some time had elapsed between his receiving the warnings and undergoing the questioning that elicited the inculpatory statement.

*United States v. Edwards*, No. 08-1124, 2009 WL 2914275, at *3 (7th Cir. Sept. 14, 2009) (awaiting publication).[11] Other circuits also apply a similar totality-of-the-circumstances analysis. *See, e.g.*, *United States v. Ferrer-Montoya*, 483 F.3d 565, 569-70 (8th Cir. 2007) (finding a one-hour break without re-administration of *Miranda* warnings to be acceptable where no evidence of staleness had been presented); *United States v. Rodriguez-Preciado*, 339 F.3d 1118, 1128-29 (9th Cir. 2005) (determining a sixteen-hour break to be permissible); *United States v. Pruden*, 398 F.3d 241, 247-48 (3d Cir. 2005) (finding a period of "perhaps twenty hours" acceptable, where the agent reminded the defendant of his *Miranda* rights and the defendant agreed to talk).

On the record before the Court, the break in questioning amounted to 45 minutes to an

---

[11] In the instant case, the officers had Neeley complete a form styled "Kentucky State Police Consent to Search." *See* Exhibit 2. However, Trooper Devasher only administered the *Miranda* warnings orally, perhaps because those warnings were not required at the time. While no requirement exists that *Miranda* rights be waived in writing, *see United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002), the Court notes that proof of waiver is often stronger for the Government with both written and oral *Miranda* waivers. Additionally, some citizens may understand language more clearly one way or the other. *See* Richard Rogers, Daniel W. Shuman, & Eric Y. Drogin, *Miranda Rights . . . and Wrongs: Myths, Methods, and Model Solutions*, 23 Criminal Justice 4, 6-7 (2008) (identifying as a myth the assumption that "oral and written *Miranda* warnings have the same effect").

hour, during which Strike Force members searched the premises extensively, turning up marijuana paraphernalia in Defendant's son's room and a short-barreled shotgun with laser scope. *See* Exhibit One, Track Four, at 00:00-00:07. When Trooper Devasher resumed interrogation, he chose not to remind Neeley of his rights and instead relied solely on the earlier *Miranda* warnings. While the better practice would have been to readminister *Miranda* warnings or at least to provide a reminder, Trooper Devasher's choice survives as sufficient here because the break in interrogation was brief and the totality of the circumstances illustrates that the knowing, voluntary, and intelligent waiver persisted. The questioning occurred during one integrated event at Neeley's home, interrupted only by the search and related events. Defendant presented no evidence of staleness or involuntariness, so the Government's evidence of Defendant's cooperative attitude, depicted by the tape and Devasher's testimony, stands. Neeley plainly was aware of his *Miranda* rights from the temporally related pre-custodial *Miranda* advice.

Defendant's motion should be denied as to the third time interval because no Fifth Amendment violation occurred. While Neeley experienced custodial interrogation, the prior *Miranda* warnings survived and provided constitutionally sufficient protections.

### III. Recommendation

For the reasons discussed, this Court **RECOMMENDS** that Defendant's motion to suppress be **DENIED**. As against this constitutional challenge, Neeley's statements should be admissible at trial.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. As defined by section 636(b)(1) and

Federal Rule of Criminal Procedure 59(b), within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for de novo consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

      This the 29th day of October, 2009.

Signed By:
*Robert E. Wier* /s/ REW
United States Magistrate Judge